RICHARDSON ELECTRICAL COMPANY, INC. *vs.* PETER
FRANCESE & SON, INC. & another;[1] TOWN OF LENOX,
third-party defendant.

Middlesex.    September 10, 1985. — October 21, 1985.

Present: BROWN, KASS, & WARNER, JJ.

*Contract*, Building contract, Warranty, Mistake, Public works, Specifications.

In an action by the electrical work subcontractor on a public works project,
seeking payment for excavating a trench across rocky terrain to accom-
modate a telephone cable as an extra not in the contract, the judge was
warranted in concluding that the plans and specifications used to obtain
bids for the project failed to give notice that the electrical subcontractor
would be required to dig a trench to accommodate telephone cable, that
the subcontractor could reasonably assume that the telephone lines would
hang, as they generally did, along the power lines, and that, con-
sequently, the subcontractor was entitled to payment for the extra work.
[50-52]

CIVIL ACTION commenced in the Superior Court Department
on October 19, 1979.

The case was heard by *Alan J. Dimond,* J.

A motion for summary judgment on a third-party complaint
was heard by *Peter F. Brady,* J.

The case was submitted on briefs.

*David O. Burbank & Ronald E. Oliveira* for Peter Francese
& Son, Inc., & another.

*Hugh C. Cowhig,* Town Counsel, for the town of Lenox.

*Sally A. Corwin & Jon C. Mazuy* for Richardson Electrical
Company, Inc.

KASS, J.    Four parties are involved in these consolidated
appeals, but, as the cases were presented in the briefs and
argument, the controversy devolves into one in which the town

---

[1] The Hartford Accident and Indemnity Company.

of Lenox, as owner of a water pumping station, and Richardson Electrical Company, Inc. (Richardson), an electrical work subcontractor, are the disputants. The question to be decided is whether the construction plans and specifications used by Lenox to obtain bids for construction of the pumping station failed to put Richardson on notice that the electrical subcontractor would have to dig an 11,000-foot trench across rocky terrain to accommodate a telephone cable.

Richardson's complaint against the general contractor, Peter Francese & Son, Inc. (Francese), sought payment for extra work and materials. Conformably with G. L. c. 149, § 29, Richardson named the bonding company, The Hartford Accident and Indemnity Company (Hartford), a codefendant. Francese impleaded Lenox as a third-party defendant, and Lenox, in turn, brought in Whitman & Howard, Inc. (Whitman & Howard), the engineers who prepared the bid documents, as a fourth-party defendant. After trial in the Superior Court without a jury, Richardson obtained a judgment of $34,112.05 against Francese and Hartford, from which both appeal. Francese obtained a judgment of $53,803.38 against Lenox, from which Lenox appeals.[2]

A summary of the facts found by the judge who heard the primary case[3] follows:

Richardson's subbid, dated May 17, 1978, undertook to furnish all the labor and materials required by § 29 ("Electrical Work") of the specifications. Those specifications included

---

[2] The third-party complaint by Francese and the bonding company against Lenox was severed for trial. That aspect of the case was disposed of by a hearing on a motion for summary judgment against the town by Francese and the bonding company. Essentially, Francese looked to the town for indemnification. The judgment in the case against the town is larger by some $19,000, mainly because of legal fees and costs of the third-party plaintiffs (Francese and Hartford) in defending the action against them by Richardson and in prosecuting the action against the town.

On the records before us, the fourth-party action by Lenox against Whitman & Howard is unresolved and perhaps is in abeyance pending final determination of liability among Richardson, Francese, and Lenox.

[3] The facts were developed in the trial of Richardson's claim against Francese and the bonding company.

trenching for an "[e]mpty telephone conduit from contact pole to telephone terminal cabinets." The plans showed a contact pole about fifty feet from the pumping structure. Section 29 (s) 11 of the specifications called upon the subcontractor to make arrangements with New England Telephone (NET) for extension of their telephone line to the station site, and § 29 (s) (9) (a) required the subcontractor to arrange with Western Massachusetts Electric Company (WMEC) for extension of primary power lines "from their nearest three phase supply (near the Richmond town line) to the station site. Western Massachusetts Electric Co. will install the pole line, last contact pole and the pad mounted transformer."

Before bidding, Richardson did, indeed, make inquiries of the respective utilities. NET told Richardson it would make no charge to bring in telephone service.[4] That was pertinent to Richardson's bid because the specifications required the electrical subcontractor to pay charges and fees levied by the utilities. WMEC informed Richardson it would charge $28,906 to bring power to the contact pole. Nothing on the plans or in the specifications showed precisely how NET would bring its service to the contact pole, although Richardson could reasonably assume that the telephone lines would hang, as they generally did, alongside the power lines. NET's "no charge" response to Richardson was consistent with that assumption.

An essential premise, however, was faulty. The town of Richmond, from which WMEC was extending power lines, was not served by NET, but by an independent local company. NET lines did not run on the power line poles in that town; consequently, there were no NET telephone wires to extend.[5] Whitman & Howard, the project engineer preparing the bid documents, had known that there was some uncertainty about

---

[4] That response appears to have been based on an assumption by NET that it would bring service in by microwave to an antenna on the contact pole. The town, as appears below, rejected that solution.

[5] Whatever may be the actual circumstance, so far as the record stands, the inability to bring in phone lines by the same access as power lines was highly unusual — contrary to the experience of the subcontractor in "well over a thousand" similar jobs.

the source of telephone service. It had made inquiry of NET on March 27, 1978, but received no reply until November 20.

There were choices for telephone transmission: overhead lines, underground lines, or microwave. Whitman & Howard, on behalf of the town, opted for underground lines after the town rejected a microwave link. That decision was made late in 1978, well after Richardson had submitted its bid. Richardson, when directed to excavate the necessary trench for an underground line, did so under protest, i.e., claiming that the work was not in the contract and that it would file a claim for it as an extra. As matters developed, some of the terrain contained ledge whose removal was beyond Richardson's technology. The general contractor had to complete the trench and back charged Richardson accordingly. Richardson had not visited the project site before making its bid, as required by § 12 (l) of the general conditions of the contract, but, the trial judge remarked, "there is nothing to indicate that a visit to the station site by Richardson would have overcome the insufficiency."

The judge concluded that the specifications were "hardly sufficient to convey to bidders the information that they needed to make intelligent bids. Failure by Whitman & Howard to resolve the questions about telephone service left the specifications seriously inadequate and unjustifiably indefinite."

As to facts we, of course, accept the findings of the trial judge unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985). *C.C. & T. Constr. Co.* v. *Coleman Bros.*, 8 Mass. App. Ct. 133, 135 (1979). Whether the terms of the construction contract were impermissibly vague is a mixed question of fact and law. Cf. *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429 (1980); *Patry* v. *Harmony Homes, Inc.*, 10 Mass. App. Ct. 1, 6 (1980). There is implied in a set of construction plans and specifications a warranty that they are accurate as to descriptions of the kind and quantity of work required. See *M.L. Shalloo, Inc.* v. *Ricciardi & Sons Constr.*, 348 Mass. 682, 686-688 (1965); *Alpert* v. *Commonwealth*, 357 Mass. 306, 321 (1970). Contrast *D. Federico Co.* v. *Commonwealth*, 11

Mass. App. Ct. 248, 251-252 (1981), in which the contract expressly stated that estimates of quantities of excavation and replacement fill required on the job were not guaranteed, thus precluding warranty of, or reliance on, the furnished estimates. Contrast also *Daniel O'Connell's Sons* v. *Commonwealth*, 349 Mass. 642, 644-648 (1965) (contract disclaimed accuracy of "limited geologic data" and warned that reliance on the information furnished would be solely at the bidders' risk).

No disclaimer or warning of corresponding force bearing on the telephone line needed appears as part of the contract documents in the instant case. To be sure, the information for bidders provided that "[t]he bidder . . . shall visit the site and shall satisfy himself as to the type and quantity of the work to be done," but, as the judge found, a site visit would not have raised an alarm that a telephone contact pole would not be available, as the drawings suggested and as inquiry of NET seemed to confirm. Lenox can expect to fare no better on another general provision in the invitation to bidders: "The locations of all utilities are . . . to be considered as approximate insofar as size, location and elevation are concerned." An approximation means coming close. We may observe with confidence that allowance for some deviation does not cover in excess of two miles.

Lenox, conceding that construction documents may be taken to contain implied warranties about technical information, argues that such warranties may be implied only if the owner or general contractor affirmatively sets forth facts upon which bidders on those documents rely. Silence, however, can, paradoxically, speak. See, e.g., *Sharratt* v. *Housing Innovations, Inc.*, 365 Mass. 141, 142-145 (1974); *Bendetson* v. *Coolidge*, 7 Mass. App. Ct. 798, 801-803 (1979). Cf. *Nei* v. *Burley*, 388 Mass. 307, 310-311 (1983). Moreover, the documents were more than merely silent on how telephone service was to come to the site. The reasonable inference was that they would come to the contact pole via the power lines, as telephone service generally did. That the means of providing telephone service were not resolved was information which Whitman & Howard never divulged to bidders.

If a contractor or a subcontractor is presented with an obvious omission, inconsistency, or discrepancy, he should take steps, by way of his own investigation, or by putting questions to the owner (or owner's representatives), to bridge gaps in the documents. *John F. Miller Co.* v. *George Fichera Constr. Corp.*, 7 Mass. App. Ct. 494, 499 (1979). If, as here, "a person furnishing labor and materials, who examines the specifications reasonably conscientiously, might miss a requirement which is out of sequence or ineptly expressed, the burden of the error falls on the issuer of the specifications . . . ." *Id.* at 498. That issuer is usually the owner, but may be a person who uses the specifications to secure a secondary level of bids, such as a prime contractor who invites bids from subcontractors. *Id.* at 498. The failure of the owner to state in its specifications that the method of telephone connection had not yet been worked out constitutes that sort of inept expression concerning a significant aspect of the electrical work on the job.

*Judgments affirmed.*